Morning, Your Honors Counsel. My name is Jess LeRone, and I represent the appellants in this matter. The Eighth Amendment gives inmates the right to be protected from assault by other inmates. In this case, the district court judge acknowledged that the constitutional deprivation suffered by Sean Kelly by being stabbed 116 times was sufficiently serious to rise to the level of an Eighth Amendment violation. The court made that finding. What the court then said was that the plaintiff had alleged insufficient facts to show deliberate indifference on the part of Director Shiro and Warden Larson. Let's take each of those individually. What facts do you have in your complaint which shows that Director Shiro knew about the staffing at Lewis Morley, had anything to do with the hiring of guards at Lewis Morley, had anything to do with the placement of guards near metal detectors at Lewis Morley? When you're on. Nothing more than she was director of the prison system. Correct. And we've also, in the attachments to our First Amendment complaint, which is submitted in an excerpt or record in this case, there is a memorandum from the director of the Arizona Department of Corrections saying that it's the purpose of the director's instruction is to provide procedures for identifying and safeguarding inmates with legitimate protection needs. I agree with you. I agree with what you're saying, that there's no way Director Shiro would have known that Sean Kelly was stabbed that day. No, no, no, not stabbed. Where are the facts under Iqbal? Under Iqbal, we know that simply alleging that Attorney General then, Attorney General Ashcroft, and Mr. Muller, the head of the FBI, knew what was going on with Iqbal was not enough. There is no supervisory liability under Bivens or under 1983. You have to show the facts which make it plausible that this government employee broke a duty imposed on him by the Constitution as to this plaintiff. And I don't see that you have any allegations that Shiro had anything to do at all with the staffing at the Lewis Morley Prison, except that she was the director of the overall prison system. But in the attachments, in the exhibits to the First Amendment complaint, we refer to the policy of the do not house with list, the policy that's created by the director and implemented by the warden of the specific Lewis Prison. The policy specifically says that these other inmates, this one inmate or other inmates that in effect stabbed Mr. Kelly, should not have been housed with or anywhere near that building. That is a policy. The plaintiff alleged in his complaint that Mr. Kelly had on numerous occasions alerted the Department of Corrections to the fact that his life was in jeopardy, that he was being threatened by the Aryan Brotherhood. But the problem is, is that with respect to the superintendent, the Shiro, he basically just alleged a respondent superior claim against the prison director. And you can't do that. What we've alleged is at some point someone, and without the ability to do discovery, at some point someone made the decision to understaff that prison. Who is that person? How would I know without discovery? You can't sue the top people. You have to go and find out through your investigation who that person is and sue that person. But as you can see in our brief and in our First Amendment complaint, the plaintiff set forth all the steps the plaintiff took to try to obtain information to learn who it was that made the decision to understaff that prison. Now, let's talk a little bit about the prison warden, which is a little bit closer to home base here. And what facts are alleged to show the prison warden's involvement in this? Once again, the facts are specific enough to say that it's up to the warden of the prison to implement the policies or procedures. If we go up the line, someone made that decision to understaff that specific prison. It's in the record that the prison as a the whole prison was just understaffed. Or is the claim that on that particular day, the way prisons were assigned to their duties and whatnot, they just didn't do a good job? I believe that, once again, this is attached in our record, that there was an internal affairs investigation that was done and a determination was made that with respect to that prison, that prison was understaffed and certain policies and procedures were not followed at that prison. There was no investigation done into other prisons in that system. So I won't go that far. But with respect to Lewis Prison, okay, ASPC Lewis, that prison was, in fact, understaffed and shouldn't have been. And it was understaffed because there weren't any guards manning the metal detection devices before the men were to go back into their cells. Right. They had the services, the religious services. There were only three guards in the yard. There should have been more. The purpose of those guards is to make sure that the inmates go back to their particular units. And don't take shanks with them. And don't take shanks with them. Then there was a metal detector to go into each of the individual units. The metal detectors weren't manned at all, period. They should have been manned. There was an investigation done. The detectors should have been manned. They weren't manned.  Once again, there was supposed to be another CSO officer, correctional officer, there to make sure that they went back into the individual units. And there shouldn't have been. I think the control officer was the one that was manning that day. But all of these procedures didn't happen. And the investigation revealed it didn't happen because they were understaffed. Mr. LaRona, let me ask you a question. After a motion to dismiss was filed, did you apply for any discovery of the person most knowledgeable in the Arizona prison system as to who were the persons who had control over the staffing at Lewis Prison? No. You can't do what, you know, you can do something called jurisdictional discovery. And you could have done discovery here, too, once the complaint was filed, before the judge actually ruled on this. Well, we, as you can see, in what we did, we tried to get the discovery. We tried to get the investigative report. Informally. Informally, informally. Public records requests were made. Then requests by me were made. Letters were sent by me. And if you'll note, what happened was after the first motion to dismiss was filed and the state argued insufficient facts, I then contacted the attorney general's office and I said, how can you argue insufficient facts if I've never even gotten the report, the investigative report? Then after I alleged that, then all of a sudden I get the report. And then after the report, then I filed my First Amendment complaint, attached all the investigative reports. Did you ask the judge for leave to amend again? Or could you amend again? I mean, is this it? I suppose that's interesting. I noticed there was no suggestion, either in your blue brief or in the district court record, of any request for further leave to amend. And that's fine. It led me to believe that you just kind of thought this was it. Right. Because I felt that at that point what I had was everything that I was going to get, without further discovery. That what I had, you know, allowing me to amend the complaint further wouldn't have done me any good because what I had was what I was going to get. So you don't think that had you been able to depose one of the supervisor officers that day, you wouldn't have learned anything more about how they made these decisions? What do you mean by that day, Judge? Well, the day that he was staffed. Based on all I know is in the investigative report that was done, when the CSO officers talked about their fear of safety because of their being understaffed, they used the term administrators, that administrators weren't listening to them. And I don't know who administrators would be without asking. All right. And who signed that report? It was, if you give me one second, I can find it. It was an internal affairs investigation. It's part of our disclosures, excerpts of record. It was Captain M. It says M. Kilgore, chief of operations. He was pulled from another prison to come and do the investigation. And there were prison, Lewis prison employees who said that they had complained about understaffing, but that the authorities had done nothing about them? Right. This is what. Were those persons named? No. This is what he says. Additionally, I spoke to supervisors and line staff and all seemed to have a low morale. They voiced concerns of safety with the staff shortages, lack of supervisor support, and lack of follow-up by administration. When asked why they cut corners, they responded by saying the job had to get done and that is the only way I could do it alone. Okay. Okay. Thank you. Good morning, Your Honors. May it please the Court. I'm Michelle Forney from the Arizona Attorney General's Office for Defendant Schrierow and Defendant Larson. I'd like to respond to some of the issues Ms. Butcher's attorney brought up. First, he said that there was a do-not-house-with policy in existence and that these inmates that were allegedly involved in the stabbing of Mr. Kelly shouldn't have been housed with together or shouldn't have been housed together. That's an issue of following the policy, not an issue of failure to enact an appropriate policy. And in his reply brief, in her reply brief, I'm sorry, she made some arguments about the fact that the complaint alleges that Director Schrierow and Warden Larson failed to enact proper policies, and that's the basis of their Eighth Amendment claim against them. There is no allegation about failure to enact policies in the amended complaint. At most, the policy or the allegations say adherence to or failure to follow existing policy, and that's exactly the type of respondent superior claim that's not allowed under the Eighth Amendment. Another thing I'd like to address is this internal affairs report. This was a report that was done after the fact. It was not addressed to Director Schrierow or to Ms. Larson, and there's no evidence in that report that they knew about that report before or knew about the issues brought up in that report about the understaffing prior to the incident involving Mr. Kelly. One of the other things I'd like to ---- Do you think it's possible that he could have alleged a claim? I think he did allege a claim for negligence. No, I mean to get over Iqbal. Possibly. The district judge knocked this case out, basically didn't allege enough facts under Iqbal to lead the district court to conclude that there was a plausibility that he would have a claim for relief against the warden and against the director. I do think a claim ---- But there were certainly other people who were involved in the prison that day, correct? Certainly. And we did provide, well, not my office, but the Department of Corrections did provide reports that provided the roster of who was staffing Lewis Complex that day all the way up to the captain of security, the department deputy warden. Somebody made some decisions about how the units were going to be staffed that day. Certainly. When they knew they were going to have this large religious event out in the yard, I gather, right? Yes, Your Honor. I mean, I imagine they think through. Maybe they don't. I have no idea. But I would imagine they would kind of have some scheme for how they're going to handle it. Well, it's no secret that Arizona has some budget issues, and so there has been widespread cutting of staff for the prisons. I'm sure that they do the best that they can with the ---- Right, but they must make some decisions about how they're going to allocate their staff for an event like that, right? Absolutely. And it's something that happens. The multi-faith services happen once a week, so it's a regular occurrence that large amounts of inmates are gathering together and then going back to their housing units. Let me ask you this, counsel. Did you ever receive any requests from the plaintiff's attorney as to who specifically made the decision as to staffing on the day in question? I did not, Your Honor. And I also want to bring up the fact that if plaintiff's counsel was unhappy with the response he got based on the time, how long it took from ABC to get the public records request, or the quality of the response he got, he had an avenue under Arizona statutes he could file a special action for wrongful denial of access to public records, and he did not do that. Well, that's, you know, more realistically, I'm not in the district court these days anymore, but I do know that you can get some discovery once you file a complaint. They have to go to the district judge and ask the district judge for the discovery, and I don't see why. Most of them are reasonable to. But that didn't happen here. He didn't ask for discovery. He just kept pushing forward, or she, Ms. Butcher, kept pushing forward the allegations that she had and felt that they were sufficient. Right. I mean, that's what I was curious about. Yes. And I also wanted to bring to the court's attention that there is a parallel action in the state court pending right now on negligence and gross negligence, wrongful death. So it's not a situation where the heirs to Mr. Kelly are being totally foreclosed of an opportunity to seek justice in this case. Even in this complaint in the district court, I think it's fair to say that he alleged enough facts to support a claim for negligence in this complaint. But negligence isn't actionable in district court, and it's not actionable against individual defendants under Arizona law. Actionable against the State. Yes. Yes. And the State has got Eleventh Amendment immunity here. Exactly. And that was an issue that was brought up in our motion to dismiss, and we prevailed on that issue, and the appellant has not sought review of that. If the Court has no further questions, I'll sit down. Thank you. Thank you. Thank you. Do you have a minute for rebuttal? Sure. I only note that just a couple points. One is I did send a letter. It's part of the excerpts of record dated June 17, 2009, requesting the investigative report and made reference to the administrative investigation being completed. And my only additional point is that at that time the plaintiff did everything within her power to try to obtain everything that she could to determine who the appropriate parties were to sue. Okay. Thank you. Thank you. We appreciate your argument. We appreciate counsel's arguments. The matter is submitted.
judges: Duffy, Paez, Bea